**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Alexander Hodorovych, individually and on behalf of all others similarly situated,<br>Plaintiff, | 1:22-cv-03415 |
| - against - | Class Action Complaint |
| Dollar General Corporation,<br>Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Dollar General Corporation ("Defendant") manufactures, markets, labels and sells pain relief patches promising to deliver 4% lidocaine under the DG Health brand ("Product").



2. Lidocaine is a topical anesthetic used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain.

3. Relevant front label representations include "Maximum Strength" and "Lidocaine 4% Topical Anesthetic."

4. The label promises and implies targeted pain relief to the "Neck, Shoulder, Back, Knee & Elbow," as the "LASTS UP TO 12 HOURS" is displayed in rifle sights, next to a humanoid image with glowing spots corresponding to the neck, back, shoulders and elbows.

5. The pain relief is represented as "Fast-acting" to provide "Numbing relief" in the form of a "Stay-put flexible patch."

## I. PRODUCT FAILS TO ADHERE TO BODY AS PROMISED

6. In 2003, the Food and Drug Administration ("FDA") initiated rulemaking to classify products which delivered lidocaine through the skin in a patch form.

7. This was because there was no data on "[t]he safe and effective concentration" of lidocaine in this format.

8. The FDA concluded that this form of transdermal drug delivery system systematically fails to adhere to the body.

9. Reports from the FDA reveal that approximately 70% of complaints about lidocaine patches are related to poor adhesion.

10. A peer-reviewed study in January of 2021 by the Journal of Pain Research found that none of the generic lidocaine patches it evaluated fully adhered to the subject's skin after 12 hours.

11. Over one-third of subjects had the patches substantially detach with a high percentage experiencing complete detachment.

12. In contrast, a newly developed 1.8% lidocaine patch technology, which is

bioequivalent to 5% lidocaine patches, maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

13. Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's Product, which has not undergone rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches, fare no better.

14. While certain companies innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body, even while exercising, upon information and belief, Defendant has not.

15. The claims that the Product "LASTS UP TO 12 HOURS" and is a "Stay-put flexible patch" are misleading because it regularly peels off the bodies of users within a few hours, and often minutes, after being applied.

16. Consumers expect that up to twelve hours will mean the Product will remains applied for no less than twelve hours or even longer.

17. The Directions confirm the Product will adhere to the user's skin for the full twelve hours because they state to "Use one patch for up to 12 hours," then "Discard patch after single use."

**Directions** Adults and children 12 years of age and over:
Clean and dry affected area. Carefully remove backing from patch starting at a corner. Apply sticky side of patch to affected area. Use one patch for up to 12 hours. Discard patch after single use.
Children under 12 years of age: consult a physician.

18. However, the Product cannot adhere to the skin for twelve hours, which renders the instructions misleading, because it assumes it will not have detached by then.

19. The result of the failure to adhere to the user's bodies is that the Product cannot deliver the "Maximum Strength" amount of lidocaine for 12 hours.

20. The Product is prone to greater detachment when engaging in regular activities such as walking, stretching, and sleeping.

21. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."

## II. MAXIMUM STRENGTH CLAIM IS MISLEADING

22. The representation that the Product is "Maximum Strength" is misleading because the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch," delivered to the target area.

23. According to the FDA, when a patch delivering lidocaine becomes "partially detached," its efficacy of delivery and absorption of the active ingredient is greatly reduced.

24. The representation that it is "Maximum Strength" tells consumers it contains and delivers the maximum amount of lidocaine available in patch form and is superior, or at least equivalent, in efficacy and results to other over-the-counter ("OTC") and prescription-strength lidocaine patches.

25. Numerous studies and reports revealed that users of the adhesive lidocaine patches seldom experience anything close to the promised hours of relief, because the patch fails to adhere for the time period promised.

## III. NUMBING RELIEF CLAIM

26. Consumers associate statements about "numbing relief" with medical treatments requiring a prescription, and FDA approval, this tells them the Product can achieve such results.

27. The claim the Product provides "Numbing Relief" to the "Neck, Shoulder, Back, Knee & Elbow" falsely implies it completely numbs pain receptors, eliminates responses to painful

stimuli, and can treat neuropathic and musculoskeletal pain, including back pain.

28. The FDA determined that statements about "numbing" pain on external analgesic products are misleading because a patch delivery system will not adhere to the body.

29. The claim about numbing relief is inconsistent with the Product's limited approval to "Temporarily relieve[] minor pain," indicated in the Drug Facts on the back label.

## IV. CONCLUSION

30. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

31. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

32. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

33. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

34. Had Plaintiff known the truth, he would not have bought the Product or would have paid less for it.

35. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $4.00 for two patches, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

36. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

38. Plaintiff Alexander Hodorovych is a citizen of Illinois.

39. Defendant Dollar General Corporation is a Tennessee corporation with a principal place of business in Goodlettsville, Davidson County, Tennessee.

40. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in hundreds of locations, in the states covered by Plaintiff's proposed classes.

41. The Product is available to consumers from Defendant's retail stores and its website.

42. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

43. This action is properly assigned to the Eastern Division of this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

44. Plaintiff Alexander Hodorovych is a citizen of Chicago, Illinois, Cook County.

45. Defendant Dollar General Corporation is a Tennessee corporation with a principal place of business in Goodlettsville, Tennessee, Davidson County.

46. Dollar General is an American retail corporation that operates a chain of over 18,000

stores throughout the nation, selling everything from outdoor furniture to groceries.

47. It was founded in 1939 with the mission of "Serving Others."

48. While Dollar General sells leading national brands, it also sells a large number of products under one of its private label brands, DG Health.

49. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

50. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

51. Products under the DG Health brand have an industry-wide reputation for quality and value.

52. In releasing products under the DG Health brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

53. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

54. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

55. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

56. Private label products under the DG Health brand benefit by their association with consumers' appreciation for the Dollar General brand as a whole.

57. Plaintiff purchased the Product at locations including Dollar General, 5701 W Belmont Ave, Chicago, IL 60634-5209, between March 2022 and April 2022, among other times.

58. Plaintiff purchased the Product to provide pain relief to his neck, back, elbows and shoulders.

59. Plaintiff believed and expected the Product provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

60. Plaintiff saw the Product was labeled and marketed as "Maximum Strength" and capable of delivering 4% lidocaine for "UP TO 12 HOURS," targeted to his "Neck, Shoulder[s], Back, Knee[s] & Elbow[s]," and read the directions on the back label, which indicated that he could use one patch for twelve hours.

61. Plaintiff saw the representations prior to his purchase and understood the Product would deliver 4% lidocaine for twelve hours.

62. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

63. Plaintiff bought the Product at or exceeding the above-referenced price.

64. Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

65. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

66. The Product was worth less than what Plaintiff paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

67. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

68. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar adhesive lidocaine patches, because he is unsure whether those representations are truthful.

Class Allegations

69. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Virginia, Montana, Wyoming, Idaho, Alaska, Virginia, West Virginia, Kansas, Nebraska, North Dakota, Iowa, Mississippi, Arkansas, South Carolina, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

70. Common questions of issues, law, and fact predominate and include whether Defendant’s representations were and are misleading and if Plaintiff and class members are entitled to damages.

71. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

72. Plaintiff is an adequate representative because his interests do not conflict with other members.

73. No individual inquiry is necessary since the focus is only on Defendant’s practices

and the class is definable and ascertainable.

74. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

75. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

76. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)

77. Plaintiff incorporates by reference all preceding paragraphs.

78. Plaintiff believed the Product provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised, and it acted quickly.

79. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

80. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

81. Plaintiff relied on the representations and omissions to believe the Product provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

82. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

83. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

84. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

85. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

86. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

87. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

88. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

89. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

90. Defendant knew the product attributes that potential customers like Plaintiff were

seeking and developed its marketing and labeling to directly meet those needs and desires.

91. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

92. Defendant's representations affirmed and promised that the Product provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

93. Defendant described the Product so Plaintiff believed it provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised, which became part of the basis of the bargain that it would conform to its affirmations and promises.

94. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

95. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality products, equal to or superior to national brands at value prices.

96. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

97. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

98. Plaintiff hereby provides notice to Defendant that it breached the express, implied and MMWA warranties associated with the Product.

99. Defendant received notice and should have been aware of these issues due to

complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

100. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

101. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

102. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it provided pain relief in the form of the maximum strength of lidocaine in the percentage indicated, to the areas referenced, and for the time period promised, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

103. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

104. Defendant had a duty to truthfully represent the Product, which it breached.

105. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high-quality products.

106. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and

commitments to quality, transparency and putting customers first, that it has been known for.

107. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

108. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

109. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

110. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

111. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it provided maximum strength lidocaine in the percentage indicated, to the areas referenced, and for the time period promised.

112. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

113. Defendant knew of the issues described here yet did not address them.

114. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

115. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;
3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;
4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;
5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and
6. Other and further relief as the Court deems just and proper.

Dated: June 29, 2022

Respectfully submitted,

/s/Spencer Sheehan

Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com